**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION**

| | |
|---|---|
| KELCY L. WARREN<br><br>*Plaintiff,*<br><br>v.<br><br>BOOZ ALLEN HAMILTON, INC.<br><br>*Defendant.* | Civil Action No. 8:24-cv-01252<br><br>**Jury Trial Demanded** |

**FIRST AMENDED COMPLAINT**

Plaintiff Kelcy L. Warren ("Warren") brings this First Amended Complaint against Defendant Booz Allen Hamilton, Inc. ("Booz Allen"), and alleges as follows:

1.      This suit arises from Booz Allen's systemic failure to safeguard its computer systems, failure to protect IRS networks and databases, and failure to monitor and restrict its personnel's data access, at the expense of the confidential tax return information of thousands of American taxpayers—including Plaintiff Kelcy Warren.

2.      Since at least 2008, Booz Allen has operated under one or more multimillion-dollar contracts with the Department of the Treasury or the IRS, through which Booz Allen accessed and reviewed tax returns and return information in the course of performing IT, data processing, cybersecurity, and tax administration services for the IRS. Despite its knowledge of criminal consequences for unauthorized inspection or disclosure, and federal obligations to safeguard this data, Booz Allen chose not to protect these confidential tax returns and return information.

3.      Instead, Booz Allen willingly allowed its employees unrestricted and unmonitored access to IRS databases and systems. This access enabled Booz Allen employees to run tailored searches to retrieve personally identifiable taxpayer data, including returns and return information, dating over a fifteen-year period. Booz Allen enabled its employees to search IRS databases using

specific keywords, as well as more generalized search parameters. Booz Allen further permitted private downloads of the confidential information to local machines and private uploads of the taxpayer data to remote and cloud-based storage—all without sufficient tracing, monitoring, or security in place. In effect, Booz Allen permitted its employees free rein with confidential taxpayer data, in derogation of its duty to American taxpayers, including Mr. Warren.

4.      This laxity soon delivered disastrous—but all too predictable—consequences. Beginning in 2018, Booz Allen's systemic failures converged in a massive data theft perpetrated by its employee Charles "Chaz" Littlejohn. During his Booz Allen tenure from 2018–2021, Littlejohn used his Booz Allen credentials to search for and download the tax returns and return information of thousands of the nation's wealthiest taxpayers, including President Donald Trump, Jeff Bezos, Elon Musk, Warren Buffet, and Michael Bloomberg. The stolen information also included the tax returns and return information of Plaintiff Kelcy Warren.

5.      On multiple occasions, Charles Littlejohn uploaded this stolen tax information to a private website. He then disclosed portions of the data to ProPublica and other media outlets, including The New York Times. ProPublica has since published nearly 50 articles using the stolen tax data on these wealthy Americans. The articles included a high-profile piece by ProPublica in December 2021 that purportedly summarized certain tax returns of President Trump, Stephen Ross, and Mr. Warren, spuriously titled "These Real Estate and Oil Tycoons Avoided Paying Taxes for Years."[1] The leading page of the article appears below, with Mr. Warren pictured at far right:

---

[1]    ProPublica, *These Real Estate and Oil Tycoons Avoided Paying Taxes for Years*, PROPUBLICA, December 7, 2021, https://www.propublica.org/article/these-real-estate-and-oil-tycoons-used-paper-losses-to-avoid-paying-taxes-for-years.



≡   Ⓟ PROPUBLICA                                                    Donate

**Regulation**

## These Real Estate and Oil Tycoons Avoided Paying Taxes for Years

Donald Trump and other ultrarich Americans have earned billions, but they've also managed to repeatedly avoid paying any federal income tax by claiming huge losses on their businesses.

6.      The 2021 article repeatedly mischaracterized Warren's tax records and payments by focusing solely on years in which Energy Transfer, the company he founded, had large depreciation resulting from large infrastructure investments, which were deductible from its other income. ProPublica seized on this misimpression to malign Warren as a billionaire "able to wipe out his income tax liabilities," who allegedly used millions in distributions to "fund an outsize lifestyle." The piece proceeded to list further details from Warren's tax returns and return information, including specifics on his real and personal property.

7.      ProPublica later issued a follow-up story in April 2022, entitled "If You're Getting a W-2, You're a Sucker." The article used confidential tax returns and return information to malign Mr. Warren further: "Texas billionaire Kelcy Warren owns a massively profitable natural gas pipeline company. But in an orgy of cake eating and having, he's able to receive hundreds of millions of dollars from his company tax-free while reporting vast losses to the IRS thanks to energy-industry and other tax breaks, his records showed."[2]

---

[2]     ProPublica, *If You're Getting a W-2, You're a Sucker*, PROPUBLICA, April 15, 2022, https://www.propublica.org/article/if-youre-getting-a-w-2-youre-a-sucker.

8.      Booz Allen's theft and disclosure through Littlejohn was not limited to a few isolated returns. Indeed, ProPublica claims to have received not just tax returns, but also information that is sent to the IRS about financial activities such as "income and taxes," "investments, stock trades, gambling winnings and even the results of audits."[3] In fact, even Congress confirmed there was "little doubt" that the leaked information to ProPublica—including Mr. Warren's confidential tax information—"came from inside the IRS" database, and that the disclosure was "precisely what 26 U.S.C. § 6103 and related statutes were designed to prevent— the disclosure of private tax information and the political weaponization of that information."[4]

9.      Booz Allen's employee, Charles Littlejohn, ultimately pleaded guilty to a violation of 26 U.S.C. § 7213(a)(1) for unlawful disclosure of confidential tax return information. In that plea, he admitted that, while working for Booz Allen, he had access to unmasked IRS data associated with thousands of the nation's wealthiest people, and that he exploited that access to unlawfully inspect and repeatedly disclose confidential tax return information to various media outlets. Since that publication, and its highly misleading characterization of his tax return history, Mr. Warren has faced ongoing injury including, but not limited to, public backlash, significant reputational harm, and loss of privacy, and economic damages.

10.     Accordingly, Mr. Warren brings this action against Booz Allen for violations of federal law, negligence, and invasion of privacy, including (a) its employee's unlawful inspections and disclosures of Warren's confidential tax return information, (b) its willful and intentional

---

[3]     ProPublica, *The Secret IRS Files: Trove of Never-Before-Seen Records Reveal How the Wealthiest Avoid Income Tax*, PROPUBLICA, June 8, 2021, https://www.propublica.org/article/the-secret-irs-files-trove-of-never-before-seen-records-reveal-how-the-wealthiest-avoid-income-tax.

[4]     Letter from Congressman Kevin Brady and Senator Mike Crapo to The Honorable Janet Yellen, Secretary of the U.S. Department of Treasury (April 18, 2022), https://gop-waysandmeans.house.gov/wp-content/uploads/2022/04/4-18-2022-Brady-Crapo-to-Yellen_FINAL.pdf.

failure to establish appropriate administrative, technical, and/or physical safeguards over access to IRS tax data by employees such as Littlejohn, and (c) its failure to ensure the security and confidentiality of Mr. Warren's confidential tax return information.

## JURISDICTION AND VENUE

11.    This Court has personal jurisdiction because Booz Allen maintains its principal place of business in McLean, Virginia.

12.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the first cause of action arises from federal statute. The Court has subject-matter jurisdiction over the remaining causes of action under 28 U.S.C. § 1367 because the claims are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. Additionally, 26 U.S.C. § 7431(a) authorizes suit in a district court of the United States for the unauthorized disclosure or inspection of tax return or return information.

13.    Venue lies in the Eastern District of Virginia pursuant to 28 U.S.C. § 1391(b) because Defendant Booz Allen resides in this judicial district.

## PARTIES

14.    Plaintiff Kelcy L. Warren is a self-made entrepreneur in the energy transportation and midstream industries. Mr. Warren is Executive Chairman and Chairman of the Board of Energy Transfer LP and has been a recognized leader in the energy industry for nearly forty years. He co-founded Energy Transfer in 1996 as a small intrastate natural gas pipeline operator. Under his leadership, Energy Transfer has grown into one of the largest and most diversified publicly traded energy companies in the industry, providing transportation and midstream services for natural gas, natural gas liquids, crude oil, and refined products across the United States. Mr. Warren resides in Dallas, Texas.

15.     Defendant Booz Allen Hamilton, Inc. is an American government and military contractor of over 32,000 employees, purportedly specializing in intelligence. Booz Allen is incorporated under Delaware law and headquartered in McLean, Virginia. The company provides consulting, analysis, and engineering services to public and private-sector organizations and nonprofits, including the Department of the Treasury and Internal Revenue Service.

16.     Charles Edward Littlejohn is a person who was employed by Booz Allen at various intervals from 2008–2021. Littlejohn performed work under Booz Allen's contracts with the Department of the Treasury and/or the IRS. At all relevant times, Booz Allen afforded Littlejohn access to IRS systems and databases that contained the confidential tax returns and tax return information of thousands of American taxpayers, including Mr. Warren. On information and belief, Littlejohn worked for Booz Allen in Lanham, Maryland at the IRS's New Carrollton Federal Building, which houses many of the IRS's information technology functions.

## FACTUAL ALLEGATIONS

### A.    The IRS's Materially Flawed Cybersecurity Infrastructure

17.     The IRS relies heavily on IT systems and electronic data to collect, process, analyze, and maintain tax returns and return information. But while that reliance has increased, the IRS's cybersecurity protections remain woefully inadequate. The Treasury Inspector General for Tax Administration ("TIGTA") has repeatedly documented these system threats.

18.     For example, a 2018 TIGTA audit identified 88 separate physical security control weaknesses and over 1,700 improperly configured user accounts within the IRS.[5] TIGTA also found that the IRS's Windows Policy Checker was out of date and used three-year-old technical

---

[5]     *See* TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, Report No. 2018-20-034, ACTIVE DIRECTORY OVERSIGHT NEEDS IMPROVEMENT AND CRIMINAL INVESTIGATION COMPUTER ROOMS LACK MINIMUM SECURITY CONTROLS, at *Highlights* (June 27, 2018).

guidelines to conduct its analysis.[6] As a result, TIGTA concluded "the IRS cannot ensure that sensitive taxpayer information and taxpayer dollars are preserved and protected."[7]

19.     Despite annual audits, TIGTA continued to find systemic failures by the IRS to establish appropriate administrative, technical, and physical safeguards to adequately protect against the unlawful disclosure of taxpayers' confidential tax return information. For example, in its *Annual Assessment of the IRS's Information Technology Program for Fiscal Year 2020*, TIGTA revealed that the IRS had failed to use "encryption algorithms" in accordance with Federal Information Processing Standards 140-2, *Security Requirements for Cryptographic Modules* for certain operating systems in order to keep confidential tax return information "unreadable for an unauthorized user."[8] Likewise, TIGTA reported that 2 out of 5 of the IRS's Cybersecurity Framework Function Areas (i.e., Identify, Protect, Detect, Respond, Recover) "were deemed as 'not effective.'"[9]

20.     TIGTA has also identified multiple security deficiencies for the IRS system that collects, converts, and stores a taxpayer's confidential tax return information into electronic records of taxpayer data. The deficiencies included "more than 16,000 policy violations."[10] In other instances, "the IRS inappropriately assigned business role accounts to an administrator group, resulting in those accounts [and thus inappropriate employees] having unnecessary elevated privileges."[11] Notably, TIGTA found that the IRS "lacked management oversight to ensure that

---

[6]     *Id.*
[7]     *Id.* at 5.
[8]     *See* TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, Report No. 2021-20-001, ANNUAL ASSESSMENT OF THE INTERNAL REVENUE SERVICE'S INFORMATION TECHNOLOGY PROGRAM FOR FISCAL YEAR 2020, at 22 (Oct. 30, 2020).
[9]     *See id.* at 7–9.
[10]    TREASURY INSPECTOR GENERAL FOR TAX ADMINISTRATION, Report No. 2020-20-006, ACTIVE DIRECTORY OVERSIGHT NEEDS IMPROVEMENT, at *Highlights* (Feb. 5, 2020); *id.* at 1–2.
[11]    *Id.* at *Highlights*.

Federal and [Internal Revenue Manual] requirements are met" and, in "critical areas" housing computer rooms, "the IRS cannot control the movement of individuals and eliminate unnecessary traffic throughout this critical security area [to] reduce the opportunity for unauthorized disclosure or theft of tax information."[12]

21.    Not only did TIGTA, through its various audits, put the IRS on notice for years of the IRS's security deficiencies, but the IRS had first-hand knowledge of its vulnerabilities based on repeated data breaches. For instance, from 2014–2015, approximately 400,000 U.S. taxpayer accounts were potentially accessed by hackers, with hundreds of thousands of additional accounts targeted.[13] Then, in 2017, IRS data from approximately 100,000 taxpayers was potentially compromised through use of a key FAFSA tool.[14] And in 2022, the IRS admitted to mistakenly publishing personal data about 120,000 individuals on its website.[15]

22.    A report from the Government Accountability Office in September 2023 also found problems with how the IRS handles taxpayer data.[16] The report found that, since 2010, 77 of the Accountability Office's recommendations for stronger safeguards had gone unheeded. The watchdog agency singled out the 14,000 IRS contractors as a potential weakness, noting that a third of the contractors had not completed a training course on protecting the records of taxpayers.

---

[12]    *Id.* at 6.

[13]    Press Release, IRS Statement on "Get Transcript" (Feb. 26, 2016), https://www.irs.gov/newsroom/irs-statement-on-get-transcript.

[14]    Written Testimony of Kenneth C. Corbin, Commissioner, Wage and Investment Division and Silvana Gina Garza, Chief Information Officer, Internal Revenue Service, Before the House Oversight and Government Reform Committee (May 3, 2017), https://oversight house.gov/wp-content/uploads/2017/05/Corbin-Garza-IRS-joint-Statement-FAFSA-5-3.pdf.

[15]    *See* Press Release, IRS Statement on Forms 990-T (Sept. 2, 2022), https://www.irs.gov/newsroom/irs-statement-on-forms-990-t; Letter from Anna Canfield Roth, Acting Assistant Secretary for Management, U.S. Department of the Treasury, to Bennie G. Thompson, Chairman of the Committee on Homeland Security (Sept. 2, 2022), https://s.wsj net/public/resources/documents/IRSBREACH.pdf.

[16]    U.S. Government Accountability Office, *Security of Taxpayer Information: IRS Needs to Address Critical Safeguard Weaknesses*, (Aug. 14, 2023), https://www.gao.gov/products/gao-23-105395.

"As a result, IRS contractors [were] at increased risk of being unprepared to handle taxpayer information."[17]

23.    The IRS and other related agencies were well-aware of these systemic data security failures. Indeed, the federal government previously retained multiple contractors—Booz Allen among them—to strengthen the IRS's cybersecurity protections.

**B.    Booz Allen Secures Billions in Government Cybersecurity and Tax Administration Contracts**

24.    In 2018, the Department of Homeland Security (DHS) issued RFPs for several multiyear contracts to protect the computer networks, electronic data, and IT systems of the IRS and other key government agencies. In February 2018, DHS awarded Booz Allen an initial six-year, $621 million contract to further develop and implement the Department of Homeland Security's Continuous Diagnostics and Mitigation ("CDM") program, a government-wide cybersecurity effort to monitor and protect federal networks across agencies that included the IRS.

25.    In August 2018, Booz Allen secured a second, even more lucrative cybersecurity contract from the same program. DHS, in partnership with the General Services Administration (GSA) Federal Systems Integration and Management Center (FEDSIM), selected Booz Allen as the prime contractor under the government-wide Continuous Diagnostics and Mitigation (CDM) Dynamic and Evolving Federal Enterprise Network Defense (DEFEND) Program for Group D, this time with a larger $1.03 billion task order. At the time, the contract was the largest federal task order and the second-largest cybersecurity task order in Booz Allen's history.

26.    The award required Booz Allen to enhance the cybersecurity capabilities of six federal agencies, including the General Services Administration, Department of Health and Human

---

[17]    *Id.*

Services, NASA, Social Security Administration, the U.S. Postal Service, and the Department of the Treasury (including the IRS). In securing this contract, Booz Allen claimed to design CDM solutions to help agency leaders understand their attack surface, detect evolving threats, make informed risk-based decisions, and act quickly. Booz Allen also touted its reputation as "the leading provider of professional security services" and its commitment to "bring the best talent and most sophisticated tradecraft together to create innovative cyber solutions at an unprecedented scale."[18]

27.    Additionally, in June 2023, Booz Allen announced yet-another IRS award. Booz Allen secured a position on the IRS Enterprise Development Operations Services (EDOS) contract, a blanket purchase agreement that could be worth $2.6 billion over a seven-year period. In this latest contract, Booz Allen will purportedly assist the IRS's IT teams in modernizing systems used to examine and collect taxes by improving efficiencies in tax administration, supporting the IRS's applications development portfolio, and implementing annual tax season legislative requirements.

28.    Under these three contracts, as well as several other agreements, the Department of the Treasury and/or IRS contracted with Booz Allen to perform cybersecurity, IT, and tax administration services for the IRS. Under those contracts and agreements, the Treasury Department and the IRS permitted Booz Allen access to IRS databases, computer networks, and other systems containing the tax returns and return information of Mr. Warren and other American taxpayers. Booz Allen then provided its employees with access to the IRS's searchable tax return databases and systems, purportedly to perform their work on these government contracts.

---

[18]    Press Release, *Department of Homeland Security Awards Booz Allen Hamilton $1.03B Task Order as Prime Contractor to Enhance Cybersecurity Capabilities across Six Federal Agencies* (Aug. 21, 2018), https://investors.boozallen.com/news-releases/news-release-details/department-homeland-security-awards-booz-allen-hamilton-103b.

29.    Under these three contracts alone, Booz Allen has or will receive over $4 billion in federal funds to enhance the cybersecurity of the IRS and other federal agencies. But these taxpayer dollars cannot mitigate the data threats to the IRS. This is because Booz Allen—the very company charged with securing IRS taxpayer data—itself has significant data vulnerabilities that preclude it from securing this sensitive information or performing tax administration services.

**C.    Booz Allen's Systemic Failures to Secure Confidential Data**

30.    Booz Allen markets itself as a global leader in cybersecurity technology and consulting, claiming to deliver adversary insight, an innovative approach, and an understanding of advanced threats and vulnerabilities to the most sophisticated global enterprises, government agencies, and national missions.

31.    Yet Booz Allen has consistently failed to address its *own* cybersecurity vulnerabilities, and instead has repeatedly permitted its employees to access, download, and disclose highly confidential government and company data. Those failures have been on full display over the last decade.

32.    In July 2011, for example, Booz Allen admitted that the hacking group "Anonymous" had infiltrated its company network and stolen a list of approximately 90,000 military email addresses and encrypted passwords. In that breach, Anonymous also misappropriated an assortment of data related to other companies and government networks served by Booz Allen. Anonymous further claimed to have accessed and deleted four gigabytes of the firm's source code and had reportedly discovered "maps and keys" for various government agencies and federal contractors within the Booz Allen unsecured network. Following the breach, Anonymous posted this pithy indictment of Booz Allen's security: "In [Booz Allen's] line of work you'd expect them to sail the seven proxseas [sic] with a state-of-the-art battleship, right? Well

11

you may be as surprised as we were when we found their vessel being a puny wooden barge," explaining that the group had "infiltrated a server on [Booz Allen's] network that basically had no security measures in place."[19] Despite receiving billions in federal contracts related to federal government cybersecurity, Booz Allen's networks apparently lacked the security measures to protect it from a decentralized group of rogue hackers.

33.     Unfortunately, Booz Allen chose not to address its data security issues. Instead, it doubled down on its lax policies, repeatedly granting its employees virtually unrestricted access to both internal company servers and the external networks, systems, and databases of its government clients.

34.     For example, in early 2013, Booz Allen assigned its employee Edward Snowden, a computer systems administrator, to work on IT systems for the National Security Agency (NSA). By May of 2013, Snowden had used his Booz Allen credentials and access to download thousands of top-secret security documents. Snowden fled the United States and leaked the classified materials to multiple journalists, disclosing national secrets and severely compromising the NSA's anti-terror surveillance program. Snowden ultimately fled to Russia, where Vladimir Putin granted him citizenship in 2022.

35.     Booz Allen's breaches of government systems continued unchecked. In 2016, authorities arrested Booz Allen computer analyst Harold Martin for stealing approximately 50 terabytes of confidential data from the NSA, in a breach that authorities have called the largest theft of classified information in U.S. history. The 50 terabytes of information from 1996 to 2016 included personal details of government employees and "Top Secret" email chains, handwritten

---

[19]   Andy Greenberg, *Anonymous Hackers Breach Booz Allen Hamilton, Dump 90,000 Military Email Addresses*, FORBES (July 11, 2011), https://www.forbes.com/sites/andygreenberg/2011/07/11/anonymous-hackers-breach-booz-allen-hamilton-dump-90000-military-email-addresses/?sh=7984ac4e76bb.

notes describing the NSA's classified computer infrastructure, and descriptions of classified technical operations. Martin's work with Booz Allen involved highly classified projects concerning government computer systems and gave him various security clearances that routinely provided him access to top-secret information. Among the material allegedly stolen by Martin was a top-secret document that contained "specific operational plans against a known enemy of the United States and its allies."[20] Martin ultimately pleaded guilty to a federal charge for stealing classified information.

36.     Another significant breach occurred the very next year. In 2017, investigators discovered that Booz Allen had left more than 60,000 confidential or sensitive files on a publicly accessible Amazon Web Services server. Given the files' accessibility, it is highly likely that malicious actors downloaded and used the publicly exposed data. The unguarded data included passwords to sensitive government systems, credentials belonging to a senior engineer at Booz Allen, vulnerability reports on government source code, and identities of government contractors with Top Secret clearances. The exposed files concerned the National Geospatial-Intelligence Agency (NGA), the Department of Defense agency that collects and analyzes data gathered by satellites and drones for the U.S. military and intelligence community. The sensitive data was available for *unrestricted public download* for at least three months in 2017.

37.     In November 2022, Booz Allen admitted yet-another significant data breach. Booz Allen's system allowed a single employee to download potentially tens of thousands of other employees' personal information from the company's internal network. Using Booz Allen's network, the employee was able to run a report containing the personal information of "active

---

[20]    Government's Response to Defendant's Motion for a Detention Hearing at 4, *United States v. Martin, III*, No. 16- 2254-BPG (D. Md. July 19, 2019).

employees as of March 29, 2021." The report contained the names, Social Security numbers, compensation, gender, race, ethnicity, date of birth, and U.S. Government security clearance eligibility and status for thousands of Booz Allen employees across the company. Booz Allen later admitted the report containing the personal information was "improperly stored on an internal SharePoint site."[21]

38.    Even worse, while Booz Allen was failing to secure its own data and that of the government, it was also overcharging American taxpayers under government contracts. In 2023, Booz Allen agreed to pay the United States a massive settlement of $377.4 million to resolve allegations of violating federal law by improperly billing commercial and international costs to its government contracts. The U.S. Government charged that, from 2011–2021, Booz Allen had improperly allocated indirect costs associated with its commercial and international business to its government contracts and subcontracts that either had no relationship to those contracts and subcontracts or were allocated to those contracts and subcontracts in disproportionate amounts. The U.S. Government has called the $377.4 million settlement one of the largest procurement fraud settlements in its history.

**D.    Booz Allen's Unlawful Access, Use, and Disclosure of Mr. Warren's Tax Information**

39.    These pervasive data security failures and unethical practices culminated in an unprecedented taxpayer data breach by Booz Allen employee Charles "Chaz" Littlejohn.

40.    From 2008 to 2010, and then again from 2012 to 2013, Littlejohn worked for Booz Allen, principally under contracts Booz Allen had obtained for IRS work in tax administration, IT services, or cybersecurity work. Booz Allen again hired Littlejohn in 2017 or 2018 as an associate

---

[21]    Booz Allen, *Consumer Breach Notification* (2022), https://oag.ca.gov/system/files/BAH%20-%20Consumer%20Notification%20Template%20-%20CA.PDF.

in its finance and economic development practice. Littlejohn remained a Booz Allen employee through approximately 2021, working for Booz Allen on contracts it had obtained from the Department of the Treasury and/or IRS for tax administration, IT services, or cybersecurity work for the IRS.

41.    As Littlejohn's employer, Booz Allen maintained direct control over his daily schedule, instructing him on which work to perform, when to perform it, the manner of the work, and for which IRS projects. Booz Allen maintained direct control over the details of Littlejohn's work, including his time spent analyzing IRS data for tax returns and return information, his project assignments, his performance benchmarks, and his performance reviews.

42.    Booz Allen issued Littlejohn a computer, as well as network and database credentials, for performing his IRS data projects. Littlejohn was enrolled in the company's regular payroll. Littlejohn's data analysis for the IRS was part of Booz Allen's regular business, for work performed under contracts with the IRS or the Department of the Treasury.

43.    On information and belief, Littlejohn took this job to advance his extreme political and ideological agenda. From prior experience on IRS contract work, Littlejohn knew he could freely access unmasked taxpayer data using his unrestricted and unmonitored access from Booz Allen. And he aimed to use his data clearance to access and disclose tax returns and return information associated with President Trump, as well as other high-net-worth individuals. Littlejohn viewed President Trump as a dangerous threat to democracy, and he intended to obtain the President's taxpayer information from the IRS and provide it to the public. Littlejohn also viewed the U.S. tax system as inequitable, and he believed wealthy Americans had evaded their tax responsibilities and had received disproportionate tax advantages. Littlejohn aimed to weaponize his access to IRS tax data to advance his radical agenda.

44.     On information and belief, Booz Allen knew of Littlejohn's extreme political views and his desire to use access to IRS data to promote those views through public disclosure of wealthy Americans' tax information. Yet Booz Allen willingly chose not to monitor Littlejohn's activities or—even worse—knew of those activities, yet blithely ignored them. At all times during Littlejohn's employment, Booz Allen had both the ability and duty to monitor Littlejohn's activities within the IRS database, including his searches, inspections, downloads, transfers, and disclosures of tax returns and return information.

45.     Without restriction or supervision from Booz Allen, Littlejohn began using the IRS databases and systems to extract data about President Trump and other high-net-worth individuals, including Mr. Warren. Littlejohn used the Booz Allen system and its access to the IRS systems and databases to download confidential tax returns and return information.

46.     In late 2018, Littlejohn used his Booz Allen credentials to access the tax returns and return information of President Trump and related entities and individuals.

47.     Littlejohn learned that IRS protocols could detect and prevent large downloads or uploads from IRS systems and devices. But on or about November 30, 2018, he exploited a loophole in those controls by using his Booz Allen credentials and computer to upload the stolen tax returns and return information of President Trump and related entities and individuals to a private website that he controlled. He then used a computer to download the data from that private website. From the original data set stored on his personal computer, Littlejohn made copies and stored them on personal data storage devices such as his Apple iPod (which, using his specialized technical skills, he had configured as a personal hard drive). At all relevant times, Booz Allen allowed Littlejohn to query, inspect, extract, download, transmit, and store this data.

48.     Approximately six months later, in or about May 2019, Littlejohn contacted The New York Times to discuss providing it with tax return data on President Trump. Between August and October 2019, Littlejohn disclosed an initial set of President Trump's tax records to The Times. In 2020, Littlejohn stole additional tax returns and return information associated with President Trump. In September 2020, The New York Times published the first of several articles that publicly disclosed the tax information of President Trump.

49.     But leaking President Trump's tax returns and return information did not satisfy Littlejohn's radical agenda of exposing taxpayer data and smearing wealthy Americans.

50.     Beginning in July 2020, again without any restriction or monitoring by Booz Allen, Littlejohn repeated his crimes. He began conducting searches to pull historic tax data on the nation's wealthiest taxpayers. Littlejohn constructed a query designed to pull data on hundreds, or even thousands, of wealthy Americans, retrieving data over a fifteen-year period. After running the query, he stole the data set in the same manner as the President's returns, using his Booz Allen computer and credentials to upload the data from the IRS database to his personal website.

51.     On information and belief, Booz Allen had no system, supervision, or other controls in place to detect or stop this data breach. Booz Allen did not monitor Littlejohn's activities on IRS systems or databases.

52.     In or about September 2020, Littlejohn contacted and discussed with ProPublica the possibility of disclosing the tax returns and return information of Mr. Warren and thousands of other American citizens.

53.     Then, from September 2020 to November 2020, Littlejohn unlawfully disclosed Mr. Warren's and thousands of others' confidential returns and return information to ProPublica using a personal storage device. In or about November 2020, Littlejohn provided ProPublica with

the password. ProPublica then published nearly 50 articles that publicly disclosed data from the returns and return information of Kelcy Warren and other taxpayers.

54.     During much of this time, and in particular between 2018 and 2021, Littlejohn was authorized by Booz Allen to access vast amounts of unmasked taxpayer data, including taxpayer returns and return information, on IRS databases. Indeed, Littlejohn's Factual Basis for Plea confirms he "was authorized, pursuant to 26 U.S.C. § 6103(n), to access vast amounts of unmasked taxpayer data, including taxpayer returns and return information, on IRS databases."[22]

55.     Booz Allen willingly allowed Littlejohn to repeatedly inspect—and repeatedly misappropriate—the confidential tax returns and return information of thousands of the nation's wealthiest taxpayers, including Mr. Warren. Booz Allen allowed Littlejohn to upload that data to a private website. And Booz Allen allowed Littlejohn to disclose that data to ProPublica.

56.     During this time, Mr. Warren diligently sought to identify the persons responsible for the unlawful disclosure of his returns and return information to ProPublica. However, the sources of the leak remained hidden. Only on or around the time Littlejohn was indicted on September 29, 2023 did Warren discover the facts necessary to state his claims against Booz Allen. While Booz Allen, ProPublica, or The New York Times were never mentioned by name in public filings from Littlejohn's criminal proceeding, Warren learned of their identities  through investigative reporting, which for the first time, included additional details about (i) Littlejohn's involvement in the leaks, (ii) Booz Allen's involvement in the leaks, and (iii) a more fulsome story of what was leaked and to whom.

57.     On information and belief, Littlejohn performed these activities, including extracting and inspecting tax data for high-net-worth individuals, at least in part to benefit Booz

---

[22]     *United States v. Charles Edward Littlejohn*, 1:23-cr-343 (D.D.C.) (ECF 9, ¶ 3).

Allen because he was requested by Booz Allen to do so, they were tasks Booz Allen expected Littlejohn to perform in the scope of his employment, and/or they reflected his ability and sophistication as an IT employee.

58.    The scope and scale of Littlejohn's unlawful disclosures appear to be unparalleled in the IRS's history. There is no precedent for a case involving the disclosure of tax return and return information associated with over a thousand individuals and entities. The human impact of Littlejohn's crimes and Booz Allen's misconduct is enormous. Many victims have come forward, expressing anger and embarrassment about the exposure of their personal financial information.

59.    Worse, it appears the harm may continue indefinitely: ProPublica has continued to publish stories using the data disclosed by Littlejohn even after he entered a plea agreement. Mr. Warren does not know the full scope of the disclosures made by Littlejohn and has been made aware only of the specific disclosures reflected in the piece-meal stories released by ProPublica. Further, on information and belief, Littlejohn also disclosed Mr. Warren's returns and return information to The New York Times. Thus, Mr. Warren is rightly concerned that additional personal information may be the subject of a news article tomorrow, next week, next month, or even next year. The harm arising from Booz Allen's misconduct and its employee's crimes is extensive and ongoing.

60.    The IRS's mission, which is to "[p]rovide America's taxpayers top quality service by helping them understand and meet their tax responsibilities and enforce the law with integrity and fairness to all," cannot be achieved without faith that IRS contractors such as Booz Allen will safeguard citizens' private information. Booz Allen's data breach has undermined that public trust and confidence in the IRS, an institution that is critical to the effective functioning of our government.

61.     Moreover, Booz Allen's laxity and misconduct egregiously breaches the trust placed in it by our government. The IRS provided Booz Allen with millions in fees and access to sensitive, unmasked data associated with millions of Americans. Instead of respecting the trust of that agency (and, by extension, hundreds of millions of individuals who shared their information with it), Booz Allen allowed its employee to exploit it for a radical political agenda.

62.     Due to ProPublica's publications of Mr. Warren's tax return information, Mr. Warren has sustained public backlash, significant reputational harm, loss of privacy, and economic damages from the tax disclosures, along with other harms and damages. Mr. Warren brings this suit to seek redress for the unlawful misappropriation and disclosure of his confidential tax information done and allowed by Booz Allen.

## VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

63.     Mr. Warren realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

64.     Booz Allen and Littlejohn had an employer-employee relationship.

65.     Littlejohn committed tortious acts within the scope of that employment relationship, including unlawfully inspecting and disclosing Mr. Warren's tax returns and return information, in violation of 26 U.S.C. § 6103 and Maryland common law.

66.     Booz Allen consented—either explicitly or implicitly—to Mr. Warren's use of Booz Allen's computers and network access, and access to IRS systems and databases, to perform tortious acts.

67.     Booz Allen had the right to control Littlejohn in the operation of his computer, network, and database access, and in his searches, inspections, downloads, and disclosures of confidential tax returns and return information.

68.     Littlejohn was motivated to commit these tortious acts at least in part to benefit Booz Allen because he was requested by Booz Allen to do so, they were tasks Booz Allen expected Littlejohn to perform in the scope of his employment, and/or they reflected his ability and sophistication as an IT employee.

69.     Accordingly, Booz Allen is vicariously liable for the torts committed by its employee, Littlejohn.

### FIRST CAUSE OF ACTION

**26 U.S.C. §§ 6103 and 7431**

70.     Mr. Warren realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

71.     26 U.S.C. § 6103 provides that tax "[r]eturns and return information shall be confidential" and applies to any "other person (or officer or employee thereof) who has or had access to returns or return information under . . . subsection (n) . . . ." *Id.* § 6103(a)(3).

72.     26 U.S.C. § 6103(n) permits the disclosure of returns and return information to any person "to the extent necessary in connection with the processing, storage, transmission, and reproduction of such returns and return information, the programming, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for purposes of tax administration."

73.     "Return" is defined as "any tax or information return, declaration of estimated tax, or claim for refund required by, or provided for or permitted under, the provisions of this title which is filed with the Secretary by, on behalf of, or with respect to any person, and any amendment or supplement thereto, including supporting schedules, attachments, or lists which are supplemental to, or part of, the return so filed." 26 U.S.C. § 6103(b)(1).

74.    "Return information" includes "a taxpayer's identity, the nature, source, or amount of his income, payments, receipts, deductions, exemptions, credits, assets, liabilities, net worth, tax liability, tax withheld, deficiencies, overassessments, or tax payments, whether the taxpayer's return was, is being, or will be examined or subject to other investigation or processing, or any other data, received by, recorded by, prepared by, furnished to, or collected by the Secretary with respect to a return or with respect to the determination of the existence, or possible existence, of liability (or the amount thereof) of any person under this title for any tax, penalty, interest, fine, forfeiture, or other imposition, or offense." 26 U.S.C. § 6103(b)(2)(A).

75.    Booz Allen is a "person . . . who has or had access to [the] returns or return information" of Mr. Warren, under 26 U.S.C. § 6103(n), because the Secretary of the Treasury, pursuant to regulations prescribed by the Secretary, disclosed Mr. Warren's returns and return information to Booz Allen "to the extent necessary in connection with the processing, storage, transmission, and reproduction of such returns and return information, the programming, maintenance, repair, testing, and procurement of equipment, and the providing of other services, for purposes of tax administration." 26 U.S.C. § 6103(n).

76.    Under 26 U.S.C. § 6103(a), no such person who has received tax returns or return information "shall disclose any return or return information obtained by him in any manner in connection with his service as such an officer or an employee or otherwise or under the provisions of this section." The statute's definition of the term "officer or employee" includes a former officer or employee. *Id.*

77.    "[D]isclosure" means "the making known to any person in any manner whatever a return or return information." 26 U.S.C. § 6103(b)(8).

78.     26 U.S.C. § 7431 provides taxpayers a private right of action for damages against any person who is not an officer or employee of the United States for the knowing or negligent unauthorized inspection or disclosure of tax return information in violation of 26 U.S.C. § 6103.

79.     On information and belief, Booz Allen, both through its own actions and through its employee, Littlejohn, repeatedly violated 26 U.S.C. § 6103 from 2018–2021 by inspecting Mr. Warren's confidential tax returns and return information, and then unlawfully disclosing that data to ProPublica. Those unlawful inspections and disclosures involved confidential information on Mr. Warren's income, real property, charitable contributions, financial and securities transactions, adjusted gross income, and information sufficient to calculate the purported effective federal income tax rates he paid over at least a decade.

80.     Booz Allen made these unlawful inspections and disclosures knowingly, or at the very least negligently or with gross negligence, including because the inspections and disclosures were made while willfully failing to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Mr. Warren's confidential taxpayer information from the unlawful inspections and disclosures alleged herein.

81.     Booz Allen made these unlawful inspections and disclosures knowingly, or at the very least negligently or with gross negligence, including because the inspections and disclosures were made while willfully failing to adequately supervise the activities of employees, such as Littlejohn, that it knew to be incompetent and capable of inflicting harm through an unauthorized inspection or disclosure of tax returns or return information.

82.     Booz Allen, both through its own actions and through its employee, Littlejohn, unlawfully inspected and disclosed Mr. Warren's tax returns and return information using Booz

Allen's computers and network access to IRS systems and databases. The unlawful inspections and disclosures were made within the scope of Littlejohn's employment at Booz Allen.

83.     Booz Allen, both through its own actions and through its employee, Littlejohn, caused the disclosure of the confidential return information to ProPublica and The New York Times with the intent that ProPublica and/or The New York Times would widely publish the information through their websites or through other means.

84.     Booz Allen's inspections and disclosures of Mr. Warren's tax return information did not result from a "good faith, but erroneous interpretation of section 6103," *see* 26 U.S.C. § 7431(b)(1), but rather from knowing violations, gross negligence, and/or negligence.

85.     Booz Allen's inspections and disclosures of Mr. Warren's tax return information were not "requested by the taxpayer," Mr. Warren, pursuant to 26 U.S.C. § 7431(b)(2).

86.     Pursuant to 26 U.S.C. § 7431(c), Mr. Warren is entitled to statutory damages in the amount of $1,000 for each act of unauthorized inspection and disclosure, plus actual damages sustained as a result of the unauthorized inspections and disclosures.

87.     Mr. Warren is also entitled to punitive damages pursuant to 26 U.S.C. § 7431(c)(1)(B)(ii) because Booz Allen's unlawful inspections and disclosures of his confidential tax return information were either willful or a result of gross negligence.

88.     Mr. Warren is entitled to the costs of the action and reasonable attorney's fees pursuant to 26 U.S.C. § 7431(c)(3) if he is the prevailing party in this action.

## SECOND CAUSE OF ACTION

### Negligent Supervision
### (Maryland Common Law)

89.     Mr. Warren realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

90.     From 2018–2021, Booz Allen performed IT, cybersecurity, tax administration, and other electronic data services for the IRS under contracts with the Department of the Treasury and/or the IRS. The IRS granted Booz Allen access to its computers, networks, and data storage locations to enable Booz Allen to perform those services. The IRS also afforded Booz Allen access to tax databases. Through access to these systems, the IRS enabled Booz Allen and its employees to search, access, download, and disclose confidential tax returns and tax return information, including that of Mr. Warren.

91.     During that time, Booz Allen employed Charles Littlejohn and staffed him on assignments that allowed him access to unmasked taxpayer data through the Booz Allen computer network and its connection to the IRS systems and databases.

92.     Littlejohn was incompetent. He was capable of inflicting harm by using his access to confidential tax returns and return information to publicly disclose that information. Littlejohn pursued employment at Booz Allen and work on IRS projects for improper political purposes and to malign wealthy Americans. Littlejohn aimed to use his employment and data access credentials to breach IRS systems, misappropriate confidential taxpayer data of Mr. Warren and others, and provide it to journalists for worldwide publication to humiliate high-net-worth taxpayers. Littlejohn willingly disregarded IRS data security and confidentiality restrictions, and unlawfully used his access to IRS data for improper political purposes. He further exploited this access to damage the reputations and businesses of wealthy Americans, including Mr. Warren.

93.     Booz Allen knew, or by the exercise of diligence and reasonable care should have known of, Littlejohn's incompetence. Booz Allen knew, or by the exercise of diligence and reasonable care should have known of, Littlejohn's ability to inflict harm through public disclosure of the tax returns and return information he accessed through his employment. Booz Allen knew,

or by the exercise of diligence and reasonable care should have known Littlejohn was capable of inflicting harm through public disclosure of the private information of Mr. Warren and other American taxpayers. Booz Allen had or should have had knowledge of Littlejohn's conduct or general character which would have caused a prudent employer in these circumstances to have taken action. On information and belief, Littlejohn made known to Booz Allen supervisors and coworkers his extreme political views, his contempt for the wealthy, and his criticisms of perceived tax advantages used by the wealthy.

94.     Booz Allen knew, or by the exercise of diligence and reasonable care should have known, that Littlejohn was improperly searching for, accessing, inspecting, stealing, and disclosing tax returns and return information. Booz Allen is one of the largest government contractors in the world, with 2023 revenue exceeding $10B. Relevant here, Booz Allen received multiple contracts from the Department of the Treasury and/or the IRS, specifically to safeguard the IRS's cybersecurity, modernize the IRS database, and assist that agency in tax administration.

95.     Booz Allen had a duty to American taxpayers, including Mr. Warren, to supervise the activities of employees such as Littlejohn and stop any unauthorized inspection or disclosure of tax returns or return information.

96.     Booz Allen controlled Littlejohn's project work, his hours, his company computer and network access, and his authorization for access to IRS systems and databases. Booz Allen's IT department had the ability and duty to monitor Littlejohn's searches, views, downloads, uploads, and other activities involving the IRS systems, databases, and taxpayer data. Yet Booz Allen either (a) monitored those activities, yet did nothing to stop them, or (b) willingly chose not to monitor those activities. Booz Allen thus breached its duty to reasonably supervise or monitor

its employees and stop any unauthorized inspection or disclosure of tax returns or return information.

97.     Booz Allen negligently permitted its employees, including Littlejohn, to use its computers, computer networks, or credentials to access IRS systems and databases that contained the tax returns and return information of Mr. Warren.

98.     Booz Allen negligently permitted its employees, including Littlejohn, unlawfully to inspect Mr. Warren's confidential tax returns and return information, and then unlawfully to disclose that information publicly to ProPublica, The New York Times, and potentially other media outlets.

99.     These actions and omissions breached Booz Allen's duty to American taxpayers, including Mr. Warren, to supervise the activities of employees such as Littlejohn and stop any unauthorized inspection or disclosure of tax returns or return information.

100.     Mr. Warren's taxpayer returns and return information are, and are entitled to be, private facts. Booz Allen negligently allowed Littlejohn publicly to disclose the private facts of Mr. Warren's tax returns and return information, which constitutes the tort of invasion of privacy.

101.     Mr. Warren's tax returns and return information are matters the disclosure of which are highly offensive to a reasonable person and are matters that are not of legitimate concern to the public.

102.     This public disclosure of Mr. Warren's tax returns and return information gave publicity to a matter concerning the private life of Mr. Warren.

103.     This public disclosure of Mr. Warren's tax returns and return information by Littlejohn, a Booz Allen employee, caused Mr. Warren's actual injuries.

104.    Booz Allen's negligent supervision and monitoring of Littlejohn proximately caused Mr. Warren's injuries by allowing the public disclosure of his tax returns and return information.

### THIRD CAUSE OF ACTION

**Invasion of Privacy**
**(Maryland Common Law)**

105.    Mr. Warren realleges and incorporates by reference each of the preceding paragraphs as if fully set forth herein.

106.    At all relevant times, Booz Allen had access to the private tax returns and return information of Mr. Warren.

107.    Mr. Warren's taxpayer returns and return information are, and are entitled to be, private facts.

108.    Mr. Warren's tax returns and return information are matters the disclosure of which are highly offensive to a reasonable person and are matters that are not of legitimate concern to the public.

109.    In or about September 2020, Booz Allen, acting through Littlejohn, contacted and discussed with ProPublica the possibility of unlawfully disclosing a copy of Mr. Warren's and thousands of others' confidential tax return information.

110.    Booz Allen, acting through Littlejohn, disclosed the taxpayer data—including that of Mr. Warren—via an encrypted USB drive to a ProPublica journalist. Then, from as early as September 2020 to at least November 2020, Booz Allen unlawfully disclosed Mr. Warren's and thousands of others' confidential returns and return information to ProPublica on a personal storage device.

111.    In or about November 2020, Booz Allen, acting through Littlejohn, disclosed the device's password to ProPublica. ProPublica then published nearly 50 articles that publicly disclosed data from the returns and return information of Kelcy Warren and other taxpayers.

112.    At all relevant times, Littlejohn was acting, at least in part, with an intent to benefit Booz Allen.

113.    Booz Allen, acting through its employee, thus made the private facts of these returns and return information public by disclosing them to journalists, who then published them on the internet. The inspection and disclosure of the tax returns and return information were done with actual malice, evil motive, and intent to injure. Specifically, Booz Allen's employee Littlejohn inspected and disclosed Mr. Warren's tax returns with the intention to cause, *inter alia*, public backlash, significant reputational harm, loss of privacy, and economic damages to Mr. Warren.

114.    Booz Allen's public disclosure of Mr. Warren's tax returns and return information gave publicity to a matter concerning the private life of Mr. Warren.

115.    Booz Allen's public disclosure of Mr. Warren's tax returns and return information proximately caused Mr. Warren's injuries.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Mr. Warren demands a trial by jury of all claims asserted in this Complaint so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kelcy L. Warren respectfully requests that the Court enter judgment in his favor and against Booz Allen, as follows:

A.     Declaring that Booz Allen willfully, knowingly, and/or by gross negligence, unlawfully inspected Mr. Warren's confidential tax return information in violation of 26 U.S.C. § 6103;

B.     Declaring that Booz Allen willfully, knowingly, and/or by gross negligence, unlawfully disclosed Mr. Warren's confidential tax return information in violation of 26 U.S.C. § 6103;

C.     Awarding Mr. Warren $1,000 in damages for each unauthorized disclosure of his tax return information, or actual damages sustained by Mr. Warren as a result of the unauthorized inspection or disclosure, pursuant to 26 U.S.C. § 7431(c)(1);

D.     Awarding Mr. Warren reasonable costs and attorney's fees pursuant to 26 U.S.C. § 7431(c)(2)-(3) and as may otherwise be permitted by law;

E.     Awarding Mr. Warren punitive damages pursuant to 26 U.S.C. § 7431(c)(1)(B)(ii) because Booz Allen's unlawful disclosure of his confidential tax return information was either willful or a result of gross negligence;

F.     Awarding Mr. Warren actual damages, punitive damages, and costs of suit under Maryland common law;

G.     Awarding pre-and post-judgment interest as allowed by law; and

H.     Any such other relief the Court deems just and proper.

Dated:  June 17, 2024                              Respectfully submitted,

By:  */s/Jeremy A. Fielding*
Sarah E. McVay
Maryland Bar No. 30256
**KIRKLAND & ELLIS LLP**
1301 Pennsylvania Avenue, NW
Washington, D.C. 20004
Tel:  (202) 389-5271
Fax:  (202) 389-5200
Email:  sarah.mcvay@kirkland.com

Jeremy A. Fielding *(pro hac vice)*
Carson D. Young *(pro hac vice)*
Sydney Corry *(pro hac vice)*
**KIRKLAND & ELLIS LLP**
4550 Travis Street
Dallas, Texas 75205
Tel:  (214) 972-1770
Fax:  (214) 972-1771
Email:  jeremy.fielding@kirkland.com
        carson.young@kirkland.com
        sydney.corry@kirkland.com

**ATTORNEYS FOR PLAINTIFF**
**KELCY L. WARREN**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed electronically on this 17th day of June, 2024, and will, therefore, be served electronically upon:

Robert A. Van Kirk
Steven M. Cady
Andrew L. Hoffman
Ilana Frier
Natalie R. Schmidt
Matthew Cunningham
WILLIAMS & CONNOLLY LLP
680 Main Avenue SW
Washington, D.C. 20024


*/s/Jeremy A. Fielding*
Jeremy A. Fielding